# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**ROBERT J. SKUBISZ,**

**Plaintiff,**

**v.**

**CAROLYN W. COLVIN, Acting Commissioner of Social Security,**[1]

**Defendant.**

**No. 12 C 10320**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert J. Skubisz[2] filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Skubisz has filed a motion for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 25(d)(1).

[2] Portions of the record refer to Plaintiff as Boguslaw Skubisz or Robert Boguslaw J. Skubisz. (*See*, *e.g.*, R. at 106–16, 119).

2d 973, 977 (N.D. Ill. 2001).[3] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[3] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Skubisz applied for DIB on February 27, 2008, alleging that he became disabled on January 1, 2004, due to back problems, loss of feeling in his left leg, and nerve damage. (R. at 19, 186, 196). The application was denied initially and on reconsideration, after which Skubisz filed a timely request for a hearing. (*Id.* at 19, 104–07, 112–18, 121–27, 130–37). On May 18, 2010, Skubisz, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 19, 40–103). The ALJ also heard testimony from Walter J. Miller, M.D., a medical expert (ME) and Grace Gianforte, a vocational expert (VE). (*Id.* at 19, 40–103, 139, 141).

The ALJ denied Skubisz's request for benefits on June 15, 2011. (R. at 19–32). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Skubisz had not engaged in substantial gainful activity from January 1, 2004, the alleged onset date, through December 31, 2008, his date last insured (DLI).[4] (*Id.* at 21). At step two, the ALJ found that Skubisz's lumbar degenerative disc disease with chronic low back pain and morbid obesity are severe impairments. (*Id.*). At step three, the ALJ determined that Skubisz does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.* at 23).

---

[4] The ALJ determined that Plaintiff last met the Act's insured status requirements on December 31, 2008. (R. at 21). Therefore, Plaintiff must establish that he was disabled between January 1, 2004, and December 31, 2008, in order to qualify for benefits. *Bjornson v. Astrue*, 671 F.3d 640, 641 (7th Cir. 2012) ("only if [the claimant] was disabled from full-time work by [her last insured] date is she eligible for benefits").

The ALJ then assessed Skubisz's residual functional capacity (RFC)[5] and determined that he has the RFC to perform light work, as defined in 20 C.F.R. § 416.967(b), except that he is limited to:

> standing/walking for about two hours in an eight-hour workday and requiring a sit-stand option. Additionally, he could occasionally stoop, kneel, crouch, crawl, or balance, but could never climb ramps, stairs, ladders, ropes, or scaffolds.

(R. at 23). At step four, the ALJ determined that Skubisz was unable to perform any past relevant work. (*Id*. at 30–31). At step five, based on Skubisz's RFC, his vocational factors and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Skubisz can perform, including assembler, bench worker/solderer, and polisher. (*Id*. at 31–32). Accordingly, the ALJ concluded that Skubisz was not suffering from a disability as defined by the Act. (*Id*. at 32).

The Appeals Council denied Skubisz request for review on July 26, 2012. (R. at 1–5). Skubisz now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of

---

[5] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. MEDICAL EVIDENCE

In 1995, Skubisz was involved in a motorcycle accident, resulting in head injuries, seizures, memory loss and a weeklong coma. (R. at 49, 66, 397). He testified that his recovery took approximately three years, and involved learning to read and write again. (*Id.* at 48.) Skubisz returned to work after the accident, but began having lower back pain. (*Id.* at 70, 274). The pain became worse over the years following the accident, Skubisz's memory problems became a significant issue for him (*id.* at 66, 274), and ultimately he stopped working in 2004. (*Id.* at 397). Skubisz became depressed and gained approximately 100 pounds, becoming morbidly obese, with a BMI of 45.5. (*Id.* at 330, 397, 409, 432).

On August 10, 2007, Skubisz presented to a health care provider regarding his intermittent lower back pain, which he stated had begun two years prior, and had become constant and severe. (R. at 357). Plaintiff described these pains as worse with activity, and additionally reported difficulty sitting or standing. (*Id.*).

On September 12, 2007, Plaintiff sought treatment at the Stroger Hospital Emergency Room for severe back pain. (R. at 276). After an MRI of his lumbar spine, on October 12, 2007, he was diagnosed with degenerative changes with facet and disc disease[6] and spinal lipomatosis,[7] at the age of 37. (*Id.* at 278-80). The MRI

---

[6] Degenerative changes in the spine "refers to osteoarthritis of the spine. Osteoarthritis is the most common form of arthritis. Doctors may also refer to it as degenerative arthritis or degenerative joint disease. Osteoarthritis in the spine most commonly occurs in the neck and lower back. With age, the soft disks that act as cushions between the spine's vertebrae dry out and shrink. This narrows the space between vertebrae, and bone spurs may develop. Gradually, your spine stiffens and loses flexibility. In some cases, bone spurs on the spine can pinch a nerve root—causing pain, weakness or numb-

revealed a central protrusion at L3-4 and left posterior paracentral disc extrusion L5-S1, contacting the left S1 nerve root. (*Id.* at 279). Plaintiff was prescribed hydrocodone to treat his pain. (*Id.*).

On February 26, 2008, Skubisz saw Peter Orris, M.D., at the Ambulatory Community Health Network. (R. at 274). Plaintiff presented with chronic lower back pain and memory problems dating back to the 1995 motor vehicle accident. (*Id.*). He reported that his back pain had significantly worsened in the last three years, and noted the pain had become particularly severe in the last three months. (*Id.*). Dr. Orris noted that while Skubisz had been prescribed pain medications, he did not take them. (*Id.*). Plaintiff also reported a shooting pain in his left leg at the medial aspect of his thigh and had gained twenty pounds due to his collective symptoms. (*Id.*). He reported no tingling or numbness. (*Id.*). Dr. Orris prescribed NSAIDs and muscle relaxants, and recommended physical therapy with a chiropractor. (*Id.*). He additionally found that Skubisz had an absent left knee jerk and positive straight leg raise at 60 degrees on the left. (*Id.*).[8]

---

ness."<http://www.mayoclinic.org/diseases-conditions/osteoarthritis/expert-answers/arthritis/faq-20058457>

[7] Spinal epidural lipomatosis "consists of the overgrowth of epidural adipose tissue in the spinal canal causing spinal cord or nerve root compression. Symptomatic SEL is very rare and most frequently associated with exogenous steroid use. Obesity and Cushing syndrome can also be associated. The idiopathic cases in which no identifiable association with SEL is found constitute only 17% of all cases. The usual clinical manifestations are chronic dorsal or lumbar pain with progressive paresthesia and weakness in the lower limbs." <http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2525894/>

[8] Testimony by the medical expert at the hearing later would directly address this finding; Dr. Walter Miller testified that the absence of a knee jerk does not indicate neurological issues, but instead is most likely the fault of the examiner, as the test is a difficult one to do properly on a person with morbid obesity, such as Skubisz. (R. at 82-83).

On May 12, 2008, Peter Biale, M.D. performed a consultative examination on behalf of the Commissioner. (R. at 282–85). Dr. Biale opined that Plaintiff "moved about without apparent hesitation, difficulty, or discomfort and ambulated normally in the examination room." (*Id.* at 283). Skubisz had "some difficulty" getting on or off the examination table due to back pain. (*Id.* at 284). He did not use an assistive device to walk, and his gait was normal. (*Id.*). Dr. Biale found decreased lumbar range of motion, muscle tenderness in the lower spinal muscles, and confirmed Skubisz's diminished sensation in his left lower leg. (*Id.*). Dr. Biale also found no muscle atropy, normal motor strength in Plaintiff's extremities, and normal hand and finger grasp. (*Id.*). Dr. Biale diagnosed Skubisz with lower back pain. (*Id.* at 285).

Skubisz also had anger management issues. (R. at 397). On July 30, 2009, Skubisz began treating with D. Troupe, M.D., who diagnosed major depressive disorder and assigned a Global Assessment Functioning (GAF) score of 49.[9] (*Id.* at 397). He noted that Skubisz reported having a "temper problem," and was arrested at Home Depot because of his "big mouth," in Skubisz's words. (*Id.*). Skubisz also reported

---

[9] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* [hereinafter *DSM IV*] 32 (4th ed. Text Rev. 2000). A GAF score of 41–50 indicates "**[s]erious symptoms**" (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). (*Id.* at 34)(boldface in original). The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

hearing voices when depressed, and experiencing some visual hallucinations. (*Id.*) Dr. Troupe prescribed Cymbalta and Risperdal. (*Id.*).

On August 6, 2009, Dr. Troupe noted that Skubisz had had no psychosis since beginning treatment with Risperdal. (*Id.* at 395). Skubisz described back pain and tension headaches, and frequently forgetting to take some of his pain medication. (*Id.*). Dr. Troupe doubled the Cymbalta dosage and continued Risperdal. (*Id.*). On August 31, 2009, Skubisz reported improved mood and no psychosis. (*Id.*). He complained of snoring and an inability to sleep lying down; he presented as fatigued. (*Id.*). Dr. Troupe recommended a sleep study, but Plaintiff said he likely could not afford it. (*Id.*)

On August 19, 2008, Skubisz was seen by Dr. Orris at the Stroger pain clinic, and reported "constant" lower back pain with radicular pain shooting down the left lower leg. (R. at 295). Dr. Orris noted that Skubisz's left knee jerk reflex was "markedly reduced," although "peripheral strength appear[ed] reasonably normal bilaterally." (*Id.* at 331). Skubisz complained of sleep issues due to the back pain, and Dr. Orris noticed Skubisz was "drowsy." (*Id.*) Dr. Orris also noted that Skubisz had a "depressed affect," and was "close to tears sometimes." (*Id.*)

In September 2008, Henry Fine, M.D., conducted a psychiatric evaluation on behalf of the Commissioner. (R. at 297–302). Skubisz reported depressed feelings and problems with short-term memory retention. (*Id.* at 298). He described difficulty falling and staying asleep. (*Id.*). Dr. Fine noted that Skubisz appeared depressed,

but his thoughts were clear of delusion and psychosis. (*Id.* at 299). Dr. Fine diagnosed major depression secondary to physical condition. (*Id.* at 301).

On October 8, 2008, Donald Henson, Ph.D., a non-examining DDS physician, reviewed the record and completed a Psychiatric Review Technique form. (R. at 303–16). He concluded that Skubisz had a "mood disorder secondary to medical condition," but did not have a severe mental impairment. (*Id.* at 303, 306). He also concluded that Plaintiff's mood disorder caused no more than mild functional limitations. (*Id.* at 313).

At an appointment with Dr. Troupe on October 8, 2009, Skubisz reported feeling "inexplicably angry" while using Cymbalta, and Dr. Troupe found that his anger may be related to "Intermittent Explosive Disorder." (R. at 396). Dr. Troupe also diagnosed major depression. (*Id.*). He prescribed Carbamazepine. (*Id.*). On October 29, 2009, Skubisz reported feeling more depressed since discontinuing Cymbalta. (R. at 393). He also described confused speech and experiencing an itching feeling at bedtime. (*Id.*). Dr. Troupe restarted Cymbalta, and prescribed Abilify and Benadryl. (*Id.*). On November 12, 2009, Dr. Troupe noted that Plaintiff has difficulty consistently taking medication because of the expense. (*Id.* at 393). Dr. Troupe accommodated Plaintiff's monetary limitations by giving him samples of Abilify and Cymbalta. (*Id.*).

On November 20, 2009, Kiranjit Deol, M.D., a treating physician, completed a chronic pain RFC assessment. (*Id.* at 369). Dr. Deol concluded that due to Skubisz's chronic knee pain and lower back pain from degenerative disc disease, he is not ca-

pable of lifting even 10 pounds, but could occasionally lift less than 10 pounds. He is capable of sitting about two hours during an eight-hour workday, and standing and walking less than two hours in an eight-hour workday. (*Id.* at 372). Skubisz would also need unscheduled breaks every 30 to 60 minutes for 5 to 10 minutes before returning to work. (*Id.*). Dr. Deol also found that Plaintiff could continuously sit for only 30 to 60 minutes and continuously stand for 5 to 15 minutes. (*Id.* at 371).

On December 3, 2009, Skubisz reported that he stopped Cymbalta because he did not like the way it made him feel, and that he ran out of Abilify samples. (R. at 394). He indicated that he was seeing another doctor for his chronic lower back pain. (*Id.*). Dr. Troupe gave him more Abilify samples. (*Id.*). On December 17, 2009, Dr. Troupe described Plaintiff as "irritable," and Skubisz reported that he was continuing to struggle with anger issues. (*Id.* at 391). Skubisz explained that he does not like taking pills because he cannot consistently remember whether he has already taken them. (*Id.* at 391). Dr. Troupe prescribed Abilify and recommended therapy. (*Id.*).

On March 4, 2010, Skubisz described himself as frustrated and fatigued, but reported feeling less angry after stopping Abilify. (R. at 391). Dr. Troupe discontinued Abilify and prescribed Lexapro, giving Plaintiff medical samples. (*Id.*). On March 18, 2010, Dr. Troupe noted that Plaintiff seemed to be feeling better and was successfully staying awake throughout the day. (*Id.* at 389.). Skubisz also indicated to Dr. Troupe that he had been working on his mother's van. (*Id.*). Dr. Troupe found Plaintiff's condition improved and prescribed Lexapro. (*Id.*).

Dr. Deol continued to see Skubisz, noting his BMI at 45.9 on February 26, 2010. (R. at 411). She continued his prescriptions for back pain as well as for his high cholesterol, high blood pressure and sleep difficulties. *(Id.* at 375–86, 411-12). Dr. Deol saw Skubisz again in April 2010, and noted his continuing health issues, a BMI of 45.5, and a need for an orthopedic/physical therapy visit. (*Id.* at 410).

At the hearing, after reviewing the record and hearing Plaintiff's testimony, Dr. Miller opined that Skubisz is impaired by his lower back pain and degenerative disc disease, as well as morbid obesity. (R. at 82–83). Dr. Miller opined that the plaintiff has full strength in his lower extremities and has the capacity to work at the light exertional level. (*Id.*). Dr. Miller further found that due to his ability to stand for only about two hours in an eight-hour workday, Skubisz would need a sit/stand option every fifteen to twenty minutes. (*Id.* at 83). Dr. Miller found that Plaintiff can only occasionally stoop, kneel, crouch, or crawl, but has no limitations with regard to pushing/pulling. (*Id.* at 84–85). Dr. Miller further opined that Plaintiff can never climb ramps, stairs, ladders, ropes, or scaffolds. (*Id.* at 84).

Skubisz testified that his pain is work prohibitive, and he has not had an occupation since closing his car dealership business in 2004. (R. at 47). He reported to Dr. Deol that he can sit for 30 to 60 minutes at a time, and can stand for 5 to 10 minutes at a time before requiring a break. (*Id.* at 371). Additionally, Skubisz testified that he can only do short projects around the house, in 5 to 10 minute increments, for approximately an hour, before requiring rest. (Id. 58, 60-61).

In his Function Report, Skubisz described his back pain as intense and debilitating. (R. at 207-14). He described his day as involving sitting on the couch with the dogs, and doing some yardwork, in 5 minute increments and with help from his wife. (Id. at 207, 209, 212, 214). He tries to go grocery shopping with his wife to get out of his home, but must lean on the shopping cart for stability and support. (*Id.* at 55). He additionally uses a back strap to minimize his lower back pain. (*Id.* at 57).

## V. DISCUSSION

Skubisz raises a single argument in support of his request to reverse or remand: the ALJ's credibility finding is "not supported by substantial evidence" and failed to "properly incorporate [the plaintiff's] subjective complaints of pain." (Mot. 1, 3). The Court agrees, and remands for a reevaluation of the Plaintiff's credibility.

Skubisz contends that the ALJ erred in discounting his testimony about the nature and extent of his ailments. (Mot. 3–5). He asserts that the ALJ's credibility determination failed to address objective medical evidence and lacked adequate explanation or specific reasoning for the characterization of his symptoms or activities. (*Id.* at 7). Skubisz argues that the ALJ failed "to make a logical bridge" connecting the evidence to his credibility, as the mere "mention of daily activities is not enough." (*Id.*).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and lim-

itations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR)[10] 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

---

[10] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Skubisz described his lower back pain as debilitating. (R. at 204-07). He can sit for only 30 to 60 minutes at a time before he is forced to lie down to alleviate his pain. (*Id.* at 371). He can stand for 5 to 15 minutes at a time before his must sit down. (*Id.* at 60-61). To get out of the house, he sometimes accompanies his wife to the grocery store; however, he must lean on the shopping cart for support to remain standing and often sits in the car while his wife loads the groceries. (*Id.* at 57–58). Around the home, Plaintiff occasionally sits on the steps with his dogs, or goes into the garage to work on cars for 30 to 60 minutes at a time, although he must sit and rest frequently. (*Id.* at 58, 61).

In her decision, the ALJ made the following credibility determination:

> After careful consideration of the evidence, I find that [Skubisz's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Skubisz's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.
>
> \*   \*   \*
>
> Various factors of [Plaintiff's] situation diminish his credibility. For instance, although he claims to have great difficulty sitting in place,

[Plaintiff] drove himself to his consultative examination in September of 2008, driving some 30 minutes to get there. Likewise, he drove himself to his hearing. [Skubisz's] driving also strongly supports the residual functional capacity, because it shows he can sit, move his extremities, and make the various small physical actions and movements that driving involves, such as turning one's head to look at mirrors, twisting to look behind the vehicle when backing up, and so forth. Additionally, [Plaintiff] has never used any assistive device to walk and was never prescribed one. He does use a back strap that he purchased himself, but it was not prescribed by any treating source. Further, [Plaintiff] is able to use public transportation, shop in stores, and grocery shop every weekend. He testified that he has trouble using public transportation, but did not deny being able to do so. Moreover, he testified that he still works on cars at home for 30 to 60 minutes at time. As for his mental condition, the record shows no treatment until August of 2009, well into the pendency of [Plaintiff's] disability claim. He testified that he went to some family counseling when he was a child, but that he did not undergo or seek out any treatment until July of 2009. Although [Skubisz] has alleged memory problems, he testified that his memory has been the same since 1997, and his memory did not prohibit him from opening and operating his own business from 1997 through 2003. Significantly, [Skubisz] was able to focus at his hearing, and he was able to concentrate and answer questions appropriately. Moreover, the record also shows [Plaintiff] has been noncompliant with medication.

(R. at 24, 27) (citations omitted).

Under the circumstances, none of the reasons provided by the ALJ for rejecting Skubisz's credibility are legally sufficient or supported by substantial evidence. First, as a preliminary matter, the ALJ failed to assess Plaintiff's credibility *before* determining his RFC. Finding Skubsiz's statements "not credible to the extent that they are inconsistent with the above residual functional capacity assessment" (R. at 25) "turn[ed] the credibility determination process on its head." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir. 2003). The ALJ's "post-hoc statement turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather

than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." *Brindisi*, 315 F.3d at 788.

Second, Skubisz's ability to "[drive] himself to his consultative examination [and hearing]" does not undermine his complaints of debilitating back pain. Skubisz testified that he could sit for only 30 to 60 minutes at a time before he must lie down due to his back pain. (R. at 371). He can stand for about 10 minutes before he must sit or lie down to relieve the pain, and he can walk around for approximately 5 minutes before he needs to sit down. (*Id.* at 60-61, 371). These statements are not inconsistent with Skubisz's ability to drive 30 minutes to his consultative examination or hearing.[11] Likewise, these statements are not inconsistent with Skubisz's ability to use public transportation, work on cars in his garage for 30 to 60 minutes at a time, or go to the grocery store when he can lean on the cart for support. Additionally, both the ALJ and the Commissioner erred in their assumptions that Plaintiff "shop[s] in stores" outside of the weekly visit to his local grocery with his wife. (*Id.* at 27; *see* Resp. 4). A closer examination of the record reveals that the only type of store Skubisz ever reported visiting is the grocery store, where he can lean on a cart for support and sit in the car while his wife loads groceries. (R. at 55) "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating [his] credibility, SSR 96-7p, at *3, this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). "The critical differences between activities of daily living and activities in a full-time job are that a person has more

---

[11] Based upon the distance between the location of the hearing and Plaintiff's listed address, his drive to the ALJ hearing was also likely no longer than 30 minutes.

flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). And here, the ALJ does not explain how Skubisz's ability to drive a car for 30 minutes, use public transportation, tinker with cars in a garage for less than an hour at a time, and occasionally grocery shop where he can lean on a shopping cart equates to the ability to work fulltime.

The ALJ also does not explain how the ability to drive a car undermines the Plaintiff's medical complaints. The ALJ assumes that Skubisz's mere ability to drive a car by performing the "various small physical actions and movements that driving involves" bolsters the RFC assessment, yet cites no medical evidence to support this analysis. (R. at 27). The ALJ offers no further explanation as to how Skubisz's ability to operate a motor vehicle creates a logical bridge to the conclusion that he can sustain fulltime employment.

Third, the lack of a prescriptive assistive device does not undermine Plaintiff's credibility. The ALJ points to plaintiff's lack of a prescriptive assistive device as evidence that his back pain cannot be as severe as stated. (R. at 27). However, Skubisz uses a back strap for his back pain, wearing it to the hearing before the ALJ. (*Id.* at 57). Plaintiff credibly explained that he favors a back strap because he believes he is too young to use an assistive device, and the back strap gives him support while allowing him to appear to be able to walk on his own. (*Id.*). Significantly, the medical evidence supports Skubisz's claim of degenerative disc disease and back pain. (*See*,

*e.g. id.* at 280). And, as mentioned above, Skubisz leans on a shopping cart for support when he accompanies his wife while grocery shopping. (*Id.* at 57).

Fourth, the ALJ provides no record support for her conclusion that Skubsiz's credibility is undermined by his "noncomplian[ce] with medication." (R. at 27). To the extent that the ALJ is referring to a February 2008 instance where Skubisz reported that he had not taken a prescribed medication, the ALJ failed to properly develop the record. At the hearing, Plaintiff testified that he did not see a doctor for his back pain initially because he could not afford the doctor visit. (*Id.* at 70). The ALJ accepted Skubisz's explanation without any further questions. (*Id.* at 70–71). For medication, at times, Skubisz continued treatment by relying on free medication samples provided by Dr. Troupe. (*See, e.g., id.* at 393). The Social Security Administration "has expressly endorsed the inability to pay as an explanation excusing a claimant's failure to seek treatment." *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) (remanding where ALJ found plaintiff not credible in part based on her failure to get consistent treatment where plaintiff had lost insurance); see SSR 96–7p, at *8 ("The individual may be unable to afford treatment and may not have access to free or low-cost medical services."). Moreover, mental health patients are notorious for inconsistently taking medication. *See Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (finding that "people with severe psychiatric problems are often incapable of taking their prescribed medications consistently"); *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the

treatment of mental illness—the difficulty of keeping patients on their medications."). If the ALJ had further concerns about Skubisz's explanation or the record evidence regarding his compliance with taking medication, she should have questioned him about it. *See* SSR 96–7p, at *7 (The ALJ "may need to . . . question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.").

Finally, the ALJ provides no evidence for how seeking psychiatric treatment "well into the pendency of [Skubisz's] disability claim" undermines his contention of mental health issues. Indeed, Skubisz testified that he "didn't know where to go" to seek mental health treatment, and that it was "very hard for [him] to find how to connect the dots," regarding his mental health. (*Id.* at 65). The ALJ accepted this explanation without further question. (*Id.*). If the ALJ believed that Plaintiff failed to timely seek mental health treatment, she should have questioned Skubisz at the administrative hearing on this issue before discounting his credibility. *Roddy*, 705 F.3d at 638–39 ("The agency requires ALJs to inquire about a claimant's reasons for not seeking treatment.").

The Court finds the ALJ's credibility determination "patently wrong." *Craft*, 539 at 678. On remand, the ALJ shall reevaluate Skubisz's complaints with due regard

for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).[12]

## VI. SUMMARY

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reconsider Skubisz's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate the plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings.

---

[12] Although the Plaintiff did not raise the issue, the Court is concerned about the ALJ's rejection of the treating physicians' opinions. The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Accordingly, "[a]n ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2); other citations omitted). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature and extent of the treatment relationship, frequency of examination, the physician's specialty, the type of tests performed, and the consistency and supportability of the physician's opinion." *Scott*, 647 F.3d at 740.

## VII. CONCLUSION

For the reasons stated above, Skubisz's Motion for Summary Judgment [22] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: September 24, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge